UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | | |
|---|---|---|
| OAKLEY BERNARD ENGESSER, | ) | Civ. 10-5039-KES |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | MEMORANDUM OPINION AND |
| | ) | ORDER GRANTING WRIT OF |
| ROBERT DOOLEY, Warden, | ) | HABEAS CORPUS |
| Yankton Minimum Unit, | ) | |
| | ) | |
| Respondent. | ) | |

Petitioner, Oakley Bernard Engesser, petitions for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. This case is both factually and procedurally rare. Here, a South Dakota circuit court found that Engesser's trial counsel was constitutionally ineffective for failing to interview and call to testify eyewitnesses Eric Eckholm and Charlotte Fowler. But the South Dakota Supreme Court reversed, finding that Engesser had not demonstrated that his *first state habeas counsel* was ineffective, which is a required threshold showing in a successive petition in South Dakota state court. Unless this threshold showing is met, a South Dakota state court may not reach the alleged error at trial. Engesser received authorization from the Eighth Circuit Court of Appeals to present a successive petition claiming that his trial counsel was ineffective because there is new evidence of Engesser's factual innocence that could not have been discovered earlier. Nearly ten years after Engesser's conviction for vehicular battery and vehicular homicide,

eyewitness Phillip Syverson came forward and testified that he saw a woman driving the red Corvette minutes before the fatal crash.

Respondent moves to dismiss Engesser's petition, arguing that it does not meet the standards for filing a successive federal habeas corpus petition set forth in the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA). Engesser contends that his petition is governed by the standard announced in *Schlup v. Delo*, 513 U.S. 298 (1995), which permits a petitioner who contends he is actually innocent to seek federal review of otherwise procedurally defaulted claims.

Because Engesser's claims satisfy either gateway standard, the court considers his ineffective assistance of counsel claim on the merits. Engesser has demonstrated that his trial counsel's performance in failing to interview and call Eckholm and Fowler as witnesses was constitutionally deficient and he was prejudiced by this error.

**PROCEDURAL HISTORY**

Engesser was convicted of vehicular homicide and two counts of vehicular battery in 2001 by a South Dakota jury. He was sentenced to twenty-five years' imprisonment in the South Dakota State Penitentiary. The sole question at Engesser's jury trial was whether he was the driver of Dorothy Finley's red Corvette when it crashed on July 30, 2000, killing Finley and injuring the occupants of a second vehicle that the Corvette struck. Engesser appealed his conviction to the South Dakota Supreme Court and a

divided court affirmed his conviction. *State v. Engesser*, 661 N.W.2d 739 (S.D. 2003).

On September 4, 2003, Engesser filed his first petition for a writ of habeas corpus in state court. Attorney Matthew Kinney was appointed to represent Engesser. Engesser raised a number of claims in his petition. His petition was denied and the state circuit court and the South Dakota Supreme Court denied his request for a certificate of probable cause.

Engesser, acting pro se, then filed his first federal petition for a writ of habeas corpus. Engesser raised six claims, which this court rejected. *Engesser v. Dooley*, No. 04-5065, 2005 WL 1278473 (D.S.D. May 26, 2005). A divided panel of the Eighth Circuit Court of Appeals affirmed. *Engesser v. Dooley*, 457 F.3d 731 (8th Cir. 2006), *cert. denied*, 549 U.S. 1223 (2007).

Subsequently, Engesser filed his second habeas petition in state court, which raised a number of ineffective assistance of trial and habeas counsel claims. Engesser received appointed counsel. After a hearing, South Dakota Circuit Judge Randall Macy granted habeas relief, finding that Engesser's first habeas counsel was ineffective because he failed to identify eyewitnesses Eckholm and Fowler in the prior habeas proceeding and his trial counsel was ineffective for failing to investigate and call Eckholm and Fowler as witnesses at trial. The South Dakota Supreme Court reversed, finding that Engesser had failed to demonstrate ineffective assistance of his first habeas counsel,

3

which is a requirement before a successive petition can be considered in South Dakota state court. *Engesser v. Dooley*, 759 N.W.2d 309 (S.D. 2008).[1]

Engesser filed a third state petition. Relief was denied and Engesser did not seek a certificate of probable cause from the South Dakota Supreme Court.

Engesser then sought permission to file a successive federal petition with the Eighth Circuit Court of Appeals. Respondent filed a motion to dismiss, arguing that Engesser had not satisfied the requirements for filing a successive petition set forth at 28 U.S.C. § 2244(b). On June 2, 2010, the Eighth Circuit Court of Appeals authorized Engesser to present a successive petition "to present a new claim that counsel was ineffective because of new evidence of Engesser's factual innocence that could not have been discovered earlier." Docket 5-1. On June 30, 2011, this court held an evidentiary hearing on Engesser's petition. Respondent objected to the court holding an evidentiary hearing, and the court reserved ruling on the objection. As discussed *infra*, Engesser has met the standard set forth at 28 U.S.C. § 2254(e)(2) necessary for a federal evidentiary hearing on his petition. Thus, respondent's objection to the evidentiary hearing is overruled.

---

[1] Respondent disagrees with this characterization of the South Dakota Supreme Court's ruling, contending the court rejected Engesser's claim that his *trial* counsel was ineffective for failing to call Fowler and Eckholm as witnesses. The characterization of the South Dakota Supreme Court's ruling is discussed later in this opinion. *See infra* Part III.

## FACTUAL BACKGROUND

**I.    The Accident**

On July 30, 2000, Engesser and Dorothy Finley were at the Full Throttle Saloon in Sturgis, South Dakota. This was just days before the Sturgis Motorcycle Rally was scheduled to begin. They left the Full Throttle in Finley's red Corvette at around 6 p.m. Trial Transcript (TT) at 228, 276, 278, 280.

Nearly two hours later, at approximately 8:10 p.m., the Corvette struck a minivan from behind on Interstate 90. *Id.* at 202-04, 298, 544, 607. The minivan, carrying the MacPherson family, was traveling on the interstate and pulled over to the left lane of traffic to avoid two vehicles parked along the shoulder. *Id.* at 305-6. Those vehicles belonged to Eckholm and Fowler. Just past the parked vehicles, the passenger side of Finley's Corvette struck  the MacPherson vehicle. *Id.* at 307, 308, 315-318. The MacPherson family sustained minor injuries in the crash. *Id.* at 312-13, 324, 326. The Corvette rolled and eventually came to a stop upside down in the median. *Id.* at 332-33. Engesser was ejected from the Corvette and Finley was trapped inside. Finley was pronounced dead at the scene of the accident. *Id.* at 405. Engesser sustained serious injuries. *Id.* at 433. Tests later revealed that both Finley and Engesser had been drinking. *Id.* at 414, 476, 479.

## II.   **Evidence at Trial**

The sole issue at Engesser's jury trial was whether he was driving Finley's Corvette at the time of the accident. The state's theory relied on several factors, including Engesser's placement in the median, Finley's placement inside the Corvette, what one expert witness referred to as "accident-injury relationships," and the position of the driver's seat inside the Corvette. The defense theory was that Finley was the driver, or put another way, that the evidence did not prove beyond a reasonable doubt that Engesser was the driver. The state called 19 witnesses at trial. The defense did not call any witnesses.

Mary Redfield, a certified registered nurse anesthetist, came upon the accident and saw the Corvette in the median. She testified that Engesser was lying in the median, six to ten feet from the driver's door of the Corvette. *Id.* at 296. When Redfield got to Engesser, he was not breathing so she lifted his jaw to clear his airway. *Id.* at 295. Redfield continued to hold his jaw until help arrived. *Id.* Redfield also testified that she could see inside the driver's side of the vehicle, because she remembered seeing the steering wheel. *Id.* at 296.

Linda Keszler also came upon the accident and saw the Corvette lying upside down in the median of the interstate. *Id.* at 289. Keszler testified that Engesser was lying "just outside the driver's door" and that the driver's door of the Corvette was "open or off." *Id.* at 290-91.

Mike Walker, a deputy with the Meade County Sheriff's Department, was one of the first law enforcement officers to arrive at the scene of the accident. *Id.* at 330-31. He testified that Engesser was lying "just outside the driver's door" or approximately "five to ten feet" from the driver's door of the Corvette. *Id.* at 331-32, 335. The driver's door of the upside down Corvette was open and Finley was on the passenger side of the vehicle. *Id.* at 333, 340. Law enforcement officers were unable to reach her through the passenger side door because of damage to the passenger side of the vehicle. *Id.* at 336. By the time Deputy Walker arrived at the scene of the accident, many cars had stopped and people were "running across the interstate." *Id.* at 337. Deputy Walker asked people if they had witnessed the crash, and if they had not, he told them to move on. *Id.* If they had witnessed the crash, Deputy Walker asked them to pull their car off the interstate, stay out of the way of ambulance and fire department workers, and wait for law enforcement to take their statements. *Id.* at 338. Deputy Walker then collected information regarding the vehicle and people for further investigation. *Id.*

Ron Koan, the fire chief for the city of Sturgis, also responded to the crash. When he arrived at the scene, he observed Engesser "lying outside the car on the ground" and estimated him to be "30 feet maybe" from the driver's side door. *Id.* at 374. Another emergency responder, LaVerne Hermanson, estimated that Engesser was "10, 15 feet, maybe a little more away" from the Corvette. *Id.* at 385.

7

Highway Patrol Officer Ed Fox was the officer in charge of investigating the crash. *Id.* at 348, 358. At the scene of the accident, Trooper Fox began to take witnesses' statements. *Id.* at 521. Two of the witnesses interviewed were Eckholm and Fowler. Once Trooper Fox finished interviewing all of the witnesses, he walked down to the Corvette, which was surrounded by broken glass. *Id.* at 522. Although the passenger side window was completely gone, the windshield and roof on top of the Corvette were intact. *Id.* at 546. During trial, Trooper Fox testified that he believed it was unlikely that the passengers of the Corvette had been tossed around much due to the size of the vehicle. *Id.* at 605. He described the inside of the Corvette as "similar to the cockpit of an airplane," with a console and two bucket seats that sit very low. *Id.* at 555. Trooper Fox testified that, based on this information and Engesser's size, he did not believe it was likely that Engesser was ejected out of the window. *Id.* at 605. Trooper Fox also noted that the driver's seat was positioned in such a manner that "somebody 5'9" would have been comfortable driving the vehicle." *Id.* at 606. Engesser is 5'9" tall, while Finley was 5'4" tall. *Id.* at 541, 543. Trooper Fox testified that before finalizing his investigation he followed up with witnesses who provided statements on the night of the accident. *Id.* at 534. Finally, he stated that he was unable to "get any information from any witnesses as far as whether it was a male or female or any information at all about the driver." *Id.* Trooper Fox further testified that he believed Engesser

8

had lied to him about who was driving the Corvette when Fox interviewed him. *Id.*

Highway Patrol Officer Anthony Melarango, an accident reconstructionist, also testified at Engesser's trial. Trooper Melarango determined that the Corvette was traveling at a speed of 112 miles per hour, or 164 feet per second, prior to the crash. *Id.* at 501. The Corvette rolled approximately one and a half times upon impact. *Id.* at 503, 507.

Rex Riis, the director of the South Dakota State Forensic Lab, examined the Corvette on August 23, 300. *Id.* at 616, 618. Riis was consulted to "give his opinion about what could be done in terms of trace evidence" in the Corvette. *Id.* at 618. Riis explained that the evidentiary value of any bodily fluids in the vehicle was diminished significantly because the Corvette had rolled and the occupants were not wearing their seat belts. *Id.* at 620. The occupants would have been tossed to and fro inside the car and bodily fluids, such as blood, could have been distributed throughout the car. *Id.* at 621. Riis suggested that the evidentiary value rested with "looking at accident injury relationships." *Id.* at 623. Riis testified that the "damage to the automobile in relationship to injuries sustained was very significant in the interpretation of where the occupants were . . . ." *Id.* at 644. On cross-examination, Riis admitted that to preserve any bodily fluids inside the Corvette, it should have been stored indoors away from the elements rather than outdoors. *Id.* at 633.

Dr. Daniel Hoffman, the emergency room physician who treated Engesser, testified that based on the photographs of the Corvette, he would expect a person sitting on the passenger side of the vehicle to have sustained fairly significant injuries. *Id.* at 452, 453.

Roana Clifford, Beau Goodman, Todd and Jackie MacPherson, Craig Johnson, Tom Wilts, Jennifer Jordan, Dr. Robert Looyenga, and Becky Feist also testified for the government. Clifford's testimony placed Engesser and Finley at the Full Throttle Saloon before the accident. She estimated that Engesser and Finley left at around six p.m. TT at 280-81. Goodman witnessed the crash, but he did not see who was driving the Corvette. *Id.* at 286-87. Todd and Jackie MacPherson were in the minivan that the Corvette struck; they testified regarding their memory of the accident and the injuries they suffered in it. *Id.* at 301-328. Craig Johnson, a deputy with the Meade County Sheriff's Office, who had responded to the accident, testified that Finley was inside the Corvette and her body had to be extricated from the vehicle. *Id.* at 352-55. Tom Wilts was the coroner who pronounced Finley dead at the scene of the accident. *Id.* at 402. He noted that Finley had a head injury on her right side and died of cerebral hemorrhage. *Id.* at 404-05. Jennifer Jordan, a medical technologist, testified that she took a sample of Engesser's blood to test his blood alcohol content (BAC) and gave it to Trooper Fox. *Id.* at 458, 459. Dr. Robert Looyenga, a chemist, testified that he did the blood alcohol analysis of Engesser's blood. *Id.* at 475. Engesser's BAC at the time of the

10

blood draw was .081. *Id.* at 477. Extrapolated back to the time of the accident, Dr. Looyenga estimated that Engesser's BAC was .125. *Id.* at 479. Finally, Becky Feist, Finley's daughter, testified that it was her mother's habit to place her purse at her feet when she rode in a car. *Id.* at 648. When Feist and other family members were permitted to see the Corvette at the lot where it was stored after the accident, they found Finley's purse underneath the dashboard on the passenger's side. *Id.*

## III.   The Hearing on the Second State Habeas

Eight witnesses testified during a hearing on Engesser's second state habeas. This was the first time that Eckholm and Fowler testified in court regarding the accident.

Beau Goodman, who also testified during Engesser's trial, testified that he had seen Finley's Corvette prior to the accident. Transcript, Hearing, State Habeas 06-578 at 4. Goodman also stated that Finley was a fast driver. *Id.*

The next witness was Matthew Kinney, who had represented Engesser in his first state habeas proceeding. Kinney testified that during the first state habeas proceeding, he focused on Engesser's trial counsel's failure to have Engesser testify, his failure to make a proper objection when Trooper Fox testified that he believed Engesser was lying when he interviewed him, his failure to object when the prosecutor referenced Trooper Fox's testimony that Engesser lied during his closing arguments, and his failure to call witnesses who could testify to Finley's driving habits. *Id.* at 7-8. Kinney also testified

11

that he was surprised when Eckholm's name came up during Engesser's first state habeas hearing. *Id.* at 9.

Eckholm testified that on July 30, 2000, his truck quit on Interstate 90 by the Tilford weigh station. *Id.* at 28. His friend, Fowler,[2] came to pick him up and parked her van in front of his truck on the shoulder of the interstate. While he was getting tools out of the back of his truck, Eckholm heard tires squeal and looked up. *Id.* at 28-29. He saw a car come by him sideways and spin backgrounds. *Id.* Eckholm testified, "that's when I looked right at both the people in the car. I saw the woman driving. I saw her frantically steering the car." *Id.* Eckholm also testified that he remembers seeing a woman's hands and bracelets. *Id.* at 47. The Corvette then hit a minivan with its back end and a man was ejected from the Corvette. *Id.* at 29. The Corvette then went into the median and the minivan went into the ditch. *Id.* Eckholm walked over to the Corvette and saw the woman trapped underneath the car. *Id.* Eckholm determined that she was dead. *Id.* at 33. He did not see the man until he was walking back to his truck. *Id.* at 29. Engesser was covered in blood and his head and back were bleeding. *Id.* at 34. Eckholm then waited to talk to the police. *Id.* Eckholm gave a written statement to a police officer, but the police officer did not write that the woman was driving. *Id.* at 35. Eckholm

---

[2] During Eckholm's testimony, he referred to Charlotte Fowler as Charlotte Delaney, her maiden name and name at the time of the accident. *See* Second State Habeas, 06-578, Transcript at 55.

testified that even though it was not in his statement, he is sure he referred to the driver as "her or she or the woman." *Id.* at 37.

Eckholm later contacted Tim Rensch, Engesser's trial attorney, after he read a newspaper article about the case. *Id.* Eckholm was also seeking representation for a DUI charge. *Id.* at 38. During the phone call, Eckholm told Rensch that a woman was driving the vehicle. *Id.* at 39. Rensch did not contact Eckholm again; Eckholm called him again a year or so later. *Id.* Then Rensch told him "that this guy was kind of a bad guy anyways and had been in some trouble, and they kind of wanted to put him away anyways." *Id.* at 38. After reading another newspaper article about Engesser, Eckholm contacted Heather Lammers Bogard, who was representing Engesser in a subsequent habeas action. *Id.* at 41.

The next witness called was Jennifer Utter, who had served as the Meade County State's Attorney in 2000. *Id.* at 53. Utter testified that she did not interview either Eckholm or Fowler in connection with the case. *Id.* Utter helped prepare the case for indictment, but she left office before it was presented to a grand jury. *Id.* at 54.

Fowler testified that she witnessed the crash. *Id.* at 56. At the time of the accident, Fowler was sitting in her van on the shoulder of Interstate 90 by the Tilford exit. *Id.* at 57. Her van was pointed east and parked directly in front of Eckholm's broken down vehicle. *Id.* Fowler testified that she was sitting in the van and suddenly a car veered into view, out of control. *Id.* at

13

58. Fowler thought the car was going to hit her van, so she clenched the steering wheel and braced herself for the impact. *Id.* As the car hit the MacPherson's minivan, she saw a man's leg and boot as a man flew through the air after the impact. *Id.* at 59. After the dust settled, Fowler ran to the man. *Id.* at 60. He was lying face down, and it looked like he could not breathe. *Id.* Fowler testified that Engesser was lying about three car lengths ahead of the Corvette in the median. *Id.* at 61. Fowler also testified that she did not give a written statement to the police because "she was shaking so bad" that she "really couldn't hold a pen to write." *Id.* at 63. The police officer wrote a statement and she signed it. *Id.* Fowler testified that law enforcement did not contact her again. *Id.* at 64.

Trooper Ed Fox, who was one of the main witnesses for the prosecution during Engesser's trial, also testified during the habeas hearing. Fox admitted that at the time of the crash, he only had three years' experience with the South Dakota Highway Patrol. *Id.* at 69. All three of the other officers who responded to the crash had more experience than he did. *Id.* Trooper Fox disputed Eckholm's and Fowler's contentions that he did not follow up with either of them after the accident. *Id.* at 75. Trooper Fox testified that, according to his notes, he called each of the witnesses to follow up. *Id.* at 76.

Engesser testified as well. He testified that he did not know Eckholm and that the first time he heard his name was from his attorney, Heather Lammers Bogard, who was appointed to represent him on his federal habeas

14

appeal to the Eighth Circuit Court of Appeals. *Id.* at 81. Nor did he know or hear about Fowler until Bogard told him about her. *Id.* His prior attorneys, Tim Rensch and Matthew Kinney, never discussed Eckholm as a witness with him. *Id.* at 82.

The next witness was Tim Rensch, who represented Engesser during his trial. Rensch testified that he first knew Eckholm was a potential witness when he received the first packet of discovery materials from the prosecution. *Id.* at 86. Neither Rensch nor his investigators spoke to Eckholm before the trial, even though he was listed as an eyewitness in the discovery materials. *Id.* at 87. Nor did Rensch or his investigators contact Fowler, although Rensch was aware of her name throughout the case. *Id.* at 89-90. Rensch further testified that when Eckholm contacted him, he was concerned that the information he provided would be more consistent with a description of Engesser than Finley, because Eckholm described the driver as having "lighter blondish hair." *Id.* at 96-97.

After Eckholm and Fowler testified at the state habeas hearing, Judge Randall Macy found that their testimony was consistent with the physical evidence after the accident, i.e., that the passenger window was shattered, Engesser was ejected from the vehicle into the median, and Finley was located inside the Corvette. *See* Attachment 1, Second State Habeas, 06-578, Findings of Fact and Conclusions of Law, at 4, ¶ 13. Judge Macy also found that "the habeas testimony of Eckholm and Fowler directly contradicts the

15

evidence presented by the State at trial." *Id.* at 5, ¶ 19. Moreover, the South Dakota Highway Patrol never marked the location of Engesser's body in relation to the scene of the accident. *Id.* at 5, ¶ 20. Nor did the South Dakota Highway Patrol photograph the position of Finley's body within the Corvette at the scene of the accident. *Id.* at 6, ¶ 21. Judge Macy also observed that "the only individual at the jury trial to testify that Engesser was the driver was Trooper Fox, who at the time of the accident had less than three years experience with the South Dakota Highway Patrol, was the least experienced trooper on the scene, and was not certified to complete accident reconstructions." *Id.* at 6, ¶ 24. Judge Macy found that both Eckholm and Fowler were "credible witnesses without identifiable bias[es]." *Id.* at 7, ¶¶ 30, 31. Judge Macy also concluded that "the strength of the evidence presented by the prosecution at the jury trial was weak[.]" *Id.* at 9, ¶ 9. Judge Macy granted Engesser's petition for a writ of habeas corpus, finding that both Engesser's first habeas counsel Matthew Kinney and his trial counsel Tim Rensch rendered ineffective assistance of counsel when they failed to discover and call Eckholm and Fowler as witnesses.

After Judge Macy granted his second habeas petition, Engesser's attorney on the petition moved to reopen the evidence to have two witnesses who had recently come forward testify on Engesser's behalf. Greg Smeenk was subpoenaed and testified on Engesser's behalf; the other witness, Todd Anderson, was unable to testify at the hearing. See Transcript, Motions

Hearing, Second State Habeas, 06-578, at 3. Smeenk testified that he was returning from a rodeo in Rapid City with his daughters when he saw what he thought was smoke by the weigh station. *Id.* at 5. When he got to the weigh station, there was a Corvette upside down in the median. *Id.* Smeenk pulled over, got out, and ran to the Corvette. *Id.* He saw a man lying back "quite a ways" and a lady attending to him. *Id.* Smeenk estimated that the man was 30 or 35 yards from the Corvette. *Id.* at 7. The Corvette was upside down and Smeenk was unable to see inside because it was too crushed. *Id.* at 5. The passenger door was into the ground so he could not open it. *Id.* Smeenk circled the Corvette, trying to figure out how to get inside. *Id.* at 6. Both the sheet metal on the driver's side door and the door latch were gone, so he started "fiddling with the mechanism that opens the door." *Id.* Eventually, Smeenk managed to pry the door open. *Id.* He crawled inside the Corvette and took the pulse of the woman inside. *Id.* After he realized nothing could be done for her, he left without talking to anyone because he did not want his daughters to see the accident site. *Id.* A few months prior to his testimony, Smeenk read an article about the accident in the Rapid City Journal and thought he should come forward. *Id.* at 8. He spoke to the Butte County Sheriff, who put him in touch with the state's attorney. *Id.*

After hearing Smeenk's testimony, Judge Macy denied Engesser's motion to reopen the evidence. *Id.* at 13-14. Judge Macy found that neither law enforcement nor Engesser's trial attorney could have discovered that

17

Smeenk was a potential witness. *Id.* Judge Macy also noted that Smeenk's testimony was consistent with Eckholm's and Fowler's testimony. *Id.*

## IV.   The Federal Evidentiary Hearing

This court held an evidentiary hearing on Engesser's second federal petition on June 30, 2011. Respondent objected to the holding of the evidentiary hearing and argued that Engesser did not meet the standard for holding an evidentiary hearing set forth at 28 U.S.C. § 2254(e)(2). Specifically, respondent argued that Engesser failed to show that the "factual predicate for his claim could not previously have been discovered through the exercise of due diligence" and that the facts underlying his claim were not "sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found [Engesser] guilty of the underlying offense." *See* Docket 68, Transcript of Federal Evidentiary Hearing at 4-6. Respondent also argued that the court should not consider the testimony of Eckholm, Fowler, and Smeenk because they had previously testified in state court. *Id.* at 6. Finally, respondent asserted that the court was also precluded from considering Shawn Boyle's testimony because the court had addressed Boyle in Engesser's first federal habeas petition, where this court considered "whether his testimony should have been admitted, or whether his statements should have been admitted . . . via Attorney Finch." *Id.* Respondent conceded that the claim was not raised as a constitutional claim in Engesser's first federal petition, but respondent asserted that this court nonetheless had

addressed the claim in the first petition as an alternative holding. *Id.* at 7.

This court reserved ruling on respondent's objections until after the hearing.[3]

The first witness called was Eckholm. Eckholm testified that he was pulled over on the shoulder of Interstate 90 by the Tilford weigh station because his truck had broken down. *Id.* at 10-11. Eckholm heard screeching tires and a red Corvette skidded by him at a high speed and hit a minivan. *Id.* at 12. He saw a woman steering the red Corvette and a man bracing himself on the windshield post. *Id.* at 13. Eckholm believes the driver was a woman because he saw jewelry sparkle, hair blowing, and "frosted type" hair. *Id.* at 13-14. Eckholm also saw the passenger be ejected out of the top of the Corvette when the Corvette hit the minivan. *Id.* at 15. Eckholm walked over to the Corvette and determined that the woman was dead. *Id.* He also saw the man in the median, approximately 25 to 30 yards from the Corvette. *Id.* at 17. When Eckholm spoke to a state trooper about the accident, he remembers using "she" and "her" to describe the driver. *Id.* at 20. At the time, Eckholm did not think there would be any question as to who was driving the Corvette. *Id.* at 21.

---

[3] The standard for granting an evidentiary hearing in a § 2254 petition for habeas corpus mirrors the AEDPA standard for successive petitions. Because Engesser satisfies that standard, he has also made the requisite showing for an evidentiary hearing in federal court. Whether the court may consider each individual witness's testimony is discussed *infra* Parts I and II.

Later, after reading something in the newspaper, and seeking representation on a DUI charge, Eckholm called Engesser's trial attorney, Tim Rensch, and told Rensch that he saw the accident. *Id.* at 21. Rensch told Eckholm he would need him. *Id.* Eckholm heard nothing further from Rensch. *Id.* at 22. When Eckholm called Rensch back, he "acted like he didn't care" and said that Engesser was a "vegetable" and "kind of a bad guy." *Id.* Several years later, in 2006, Eckholm read a newspaper article about the case and contacted Engesser's new attorney, Heather Lammers Bogard. *Id.* at 23. Eckholm was deposed about the accident and subsequently testified in the second state court habeas action. *Id.*

Fowler was the second witness Engesser called during the federal evidentiary hearing. Fowler was with Eckholm at the side of Interstate 90 near Tilford Station because his truck had broken down. *Id.* at 57. While she sat inside her van, Fowler saw the Corvette zooming towards them in the driver's side mirror. *Id.* at 57. Fowler thought the Corvette was going to hit her van and Eckholm (who was outside of the van), and she screamed. *Id.* Fowler heard a boom on impact as the Corvette struck a minivan, and she saw a man's leg as a man flew through the air. *Id.* at 60. After the dust settled, Fowler ran to the median where the man lay and wiped dirt out of his mouth so he could breathe. *Id.* at 60. Fowler estimated that he was lying approximately 120 feet, or 17 car lengths, away from the Corvette. *Id.* at 61.

After the accident, Fowler realized she and Eckholm had seen the Corvette earlier that day in Sturgis. *Id.* at 58. At that time, a woman, who Fowler described as "a little blonde with highlights" was driving the vehicle. *Id.* When asked to elaborate on the woman's hairstyle, Fowler described it as not quite shoulder length, with a mixture of light and dark highlights, and stated that it looked like it had been back combed to give it volume. *Id.* at 63.[4] After the accident, Fowler talked to a state trooper, and she assumed that the woman (Finley) was the driver, but the trooper did not write it down when she referred to the driver as female. *Id.* at 62. Although she does not remember the phone call, Fowler conceded that if Trooper Fox's notes indicated that he followed up with her after the accident, he probably did. *Id.* at 76. Other than the follow-up phone call, Fowler was not contacted about this case until the 2007 state habeas proceeding. *Id.*

Smeenk was driving home from a rodeo in Rapid City with his daughters when he came upon the accident. *Id.* at 79. Smeenk saw smoke by the weigh station and a minivan in the median, so he pulled over and went to the Corvette. *Id.* at 80. The Corvette was upside down in the median and "crunched down," making it difficult to see inside. *Id.* Smeenk saw a lady attending to a man "back a ways" from the Corvette. *Id.* at 80-81. Smeenk estimated they were 30 yards from the car. *Id.* at 83. He walked around the

---

[4] Fowler currently runs a beauty salon in Union, Texas. Docket 68, Transcript of Evidentiary Hearing, at 55.

Corvette and noticed that the passenger side was completely crunched in. *Id.*
at 82. Although the sheet metal was gone on the driver's side door, Smeenk
managed to get the door open on that side. *Id.* He reached in and took Finley's
pulse. *Id.* After concluding she was dead and there was nothing he could do,
Smeenk left because he wanted to get his children away from the accident
scene. *Id.* at 82. Years later, Smeenk read about Engesser's case in the Rapid
City Journal. *Id.* at 83. Smeenk called the Butte County Sheriff, who was a
friend of his, and the sheriff helped Smeenk contact the Meade County State's
Attorney in 2007. *Id.* at 83. Smeenk testified before Judge Macy during a
motions hearing held on October 29, 2007, in the second state habeas
proceeding. *Id.* at 84.

Boyle was working as security at the Full Throttle Saloon in Sturgis,
South Dakota, on the day of the accident. *Id.* at 95. Boyle was acquainted
with Finley and described her as having brown hair with highlights. *Id.* at 93-
94. Boyle talked to Finley and Engesser for around 10-15 minutes the day of
the accident. *Id.* at 95-96. Both Finley and Engesser were drinking beers, but
neither appeared to be under the influence. *Id.* at 97. Around 6:30 or 7 p.m.,
Boyle saw the two leave. *Id.* at 96. Finley got into the driver's seat of her red
Corvette and the two left. *Id.* at 97-98. Boyle testified that the Full Throttle
Saloon was about 8-10 miles from the interstate and that traffic that day
would have been heavy due to the upcoming Sturgis Motorcycle Rally. *Id.* at
108.

22

The 2011 federal evidentiary hearing was the first time Boyle testified in court about the accident. Around the time of the accident, Boyle had legal troubles of his own. *Id.* at 98-99. After being involved in a car accident himself, Boyle was facing a potential fourth DUI charge so he decided to leave South Dakota. *Id.* Boyle went to Florida in December of 2000. *Id.* at 99. Boyle eventually came back to South Dakota to face the charges against him, and he pleaded guilty to failure to appear and failure to report an accident. *Id.* at 103. Boyle served two weeks in jail before he was released on bond and eventually sentenced to two years of probation. *Id.* After leaving South Dakota in 2000, the first time Boyle was contacted about the accident was approximately three weeks before the federal evidentiary hearing when an investigator working for Engesser's attorney contacted him. *Id.* at 105.

Syverson testified that he saw the Corvette immediately prior to the accident. *Id.* at 111. The Corvette entered Interstate 90 at the on-ramp at mile marker 32 heading east. *Id.* Syverson was driving his vehicle on Interstate 90 heading east toward Rapid City with his wife and daughter in the car. *Id.* The Corvette was next to Syverson's vehicle trying to merge onto Interstate 90. *Id.* The on-ramp in question ran parallel to the interstate for a quarter to a third of a mile; thus the Corvette on the on-ramp was parallel to Syverson's car on Interstate 90 for almost a third of a mile. *Id.* at 112. Before the on-ramp was redone several years ago, it was much longer than a typical on-ramp. *Id.* at 125-36. Syverson noticed the red Corvette and looked over at the driver. *Id.* at

23

112. He observed that the driver had feminine features and a feminine hairstyle. *Id.* Syverson described the driver's hair as "poofy" or as looking like she had used a curling iron on it, not long, and medium brown. *Id.* at 113. He also testified that the driver was "smaller in stature." *Id.* at 114. The Corvette was going approximately the same speed as Syverson's car for the majority of the distance of the on-ramp until the last hundred yards or so, when it sped up "to a very high speed" and shot ahead of his car. *Id.* Syverson paid attention to the vehicle and the driver because he needed to determine whether to move over, yield to the red Corvette, or speed up. *Id.* Approximately four minutes later, Syverson came upon the Corvette upside down in the median. *Id.* Syverson stopped his car and his wife went to help the people in the minivan in the ditch. *Id.* Syverson stayed with his daughter and when his wife returned, they left without talking to law enforcement because they had not witnessed the accident. *Id.* at 112. When shown a photograph of Finley taken around the time of the accident, Syverson testified that the driver had similar hair and features. *Id.* at 115. When shown a photograph of Engesser taken during his hospitalization after the accident, Syverson stated "in no way was that the driver" and that it "couldn't have been [him] unless he was wearing a wig." *Id.* at 116. Syverson also testified that from his view of the profile of the driver, the driver did not have any facial hair. *Id.* at 127. When Syverson saw a photograph of Engesser, who had facial

hair at the time, "that convinced [him] even more that he wasn't driving because there was no facial hair." *Id.*

Syverson was first contacted approximately one month before the federal evidentiary hearing. *Id.* at 117. Syverson does not know Engesser. *Id.* at 126. He was contacted because the accident was discussed at his work place, Rapid City Chevrolet. *Id.* at 127. The accident came up four or five years ago when the employees at Rapid City Chevrolet had to identify the owner of a Chevy SSR, which is a Corvette pickup or sports-type vehicle, by its VIN number after it was totaled in a vehicular accident. *Id.* at 128. While the employees were discussing other sports-type vehicle accidents, Syverson mentioned that he had seen the red Corvette accident a few years earlier on Interstate 90, and his co-worker, Rusty Engesser, mentioned that his cousin was in that accident. *Id.* at 127. Rusty Engesser worked at Rapid City Chevrolet for around two years, and Syverson did not socialize with him outside of work. *Id.*

The final witness to testify during the federal evidentiary hearing was Phyllis Gillies. Gillies had known Finley since 1992, when they met through mutual friends. *Id.* at 132. She and Finley met for coffee several times a week. *Id.* Gillies described Finley as petite, around 5'4" to 5'5" tall, and conscientious about her appearance. *Id.* at 133, 138. She described Finley's hair style as medium length, permed, and reddish brown in color with no

gray. *Id.* at 134. Gillies also testified that Finley loved her red Corvette and liked to speed. *Id.* at 137.

## DISCUSSION

Engesser and respondent dispute the standard applicable to his claim. Respondent argues Engesser's claim should be analyzed under the AEDPA standard for successive petitions. Engesser contends that the rule set forth in *Schlup v. Delo*, 513 U.S. 298 (1995), is the appropriate standard. Both are "gateway" standards, which, if met, would permit the court to consider Engesser's procedurally defaulted claim of ineffective assistance of counsel on the merits. Engesser's ineffective assistance of counsel claim is predicated on his trial counsel's failure to investigate, interview, and subsequently call at trial eyewitnesses Eckholm and Fowler. Engesser contends that the testimony of eyewitnesses Eckholm, Fowler, and Syverson, coupled with the testimony of Smeenk, Boyle, and Gillies, demonstrates his actual innocence.

The Eighth Circuit Court of Appeals has not reached the issue of which standard governs a successive federal habeas petition that asserts an actual innocence "gateway" claim. Other courts have observed that "[t]here is a question whether such a claim is governed by the *Schlup* standard itself, or by the AEDPA conditions for filing a second or successive application, 28 U.S.C. §§ 2244(b)(2)(B)(i) and (ii)." *Cooper v. Brown,* 510 F.3d 870, 876 (9th Cir. 2007) (finding petitioner failed to meet either standard). Because the appropriate standard is an open question in the Eighth Circuit, the court will analyze

Engesser's claim under both the AEDPA standard for successive petitions and the *Schlup* standard.

## I.      The AEDPA Standard for Successive Petitions

The Eighth Circuit Court of Appeals authorized Engesser to file a successive federal petition after it found he had made a prima facie showing that he satisfied the AEDPA conditions for filing a successive petition. *See* Docket 5-1, Authorization; 28 U.S.C. § 2244(b)(4). But this finding is not binding on the district court, nor should it be accorded any persuasive weight. Rather, it is "simply a sufficient showing of possible merit to warrant a fuller exploration by the district court" that gets the petitioner through one of two procedural gates he must pass through before the merits of his claim are considered. *Bennett v. United States*, 119 F.3d 468, 469 (7th Cir. 1997) (Posner, J.). *See also Jordan v. Sec'y, Dep't of Corr.*, 485 F.3d 1351, 1358 (11th Cir. 2007); *Goldblum v. Klem*, 510 F.3d 204, 219 (3d Cir. 2007); *In re Lott*, 366 F.3d 431, 432-33 (6th Cir. 2004); *In re Johnson*, 322 F.3d 881, 883 (5th Cir. 2003); *Bell v. United States*, 296 F.3d 127, 128 (2d Cir. 2002); *Reyes- Requena v. United States*, 243 F.3d 893, 898-99 (5th Cir. 2001); *Thompson v. Calderon*, 151 F.3d 918, 925 (9th Cir. 1998); *Rodriguez v. Superintendent, Bay State Corr. Ctr.*, 139 F.3d 270, 273 (1st Cir. 1998), *overruled on other grounds by Bousley v. United States*, 523 U.S. 614 (1998). Thus, the threshold issue is whether Engesser has satisfied the standard for filing a successive petition.

27

Under the AEDPA, the district court must dismiss a successive petition unless the "factual predicate of the claim could not have been discovered previously through the exercise of due diligence" and the facts "establish by clear and convincing evidence, that but for the constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." 28 U.S.C. §§ 2244(b)(2)(B)(i)-(ii); 2244(b)(4).[5] The hurdle that this standard imposes has been equated to a showing of "a high probability of actual innocence." *Gonzalez v. Crosby,* 545 U.S. 524, 530 (2005). The standard for successive petitions is more stringent than the *Schlup* standard. *See Cooper v. Woodford*, 358 F.3d 1117, 1119 (9th Cir. 2004). Engesser was authorized to present a new claim of ineffective assistance of counsel because there is "new evidence of Engesser's factual innocence that could not have been discovered earlier." Docket 5-1, Authorization to File Successive Petition.

Eckholm, Fowler, Smeenk, Boyle, Syverson, and Gillies testified during the federal hearing. The testimony of Eckholm, Fowler, and Smeenk does not qualify as new evidence because they have previously testified in state court. Whether Boyle's testimony constitutes new evidence under § 2244(b)(2)(B)(i) is a more difficult question. Engesser and his attorney were aware of Boyle's testimony at the time of trial. Boyle told Engesser's civil attorney, Dennis

---

[5] Engesser does not contend that his claim relies on a new rule of constitutional law made retroactive by the United States Supreme Court. Thus, his claim is analyzed under §§ 2244(b)(2)(B)(i)-(ii).

Finch, that he saw Finley and Engesser leave the bar together earlier in the evening and that Finley was driving her own car. But at the time of trial, Boyle had fled South Dakota to avoid prosecution. While he was unavailable as a witness, the evidence was known to Engesser and his attorney at the time of trial.[6] Thus, Boyle's testimony does not qualify as new evidence under § 2244(b)(2)(B)(i). Gillies testified that she has known Finley since 1992. Gillies is not a newly discovered witness under § 2244 because her testimony could have been discovered through the exercise of due diligence.

But Engesser did present one witness during the federal hearing who qualifies as new evidence under § 2244. Syverson testified that he saw a woman driving the Corvette just minutes before the fatal crash. Syverson had not been contacted about this case until a few weeks prior to the federal evidentiary hearing. After stopping at the scene of the accident, Syverson did not linger, but rather left without speaking to law enforcement officers. His name was not listed as a witness to the crash or the events preceding it. Thus, neither Engesser nor his attorney could have discovered that Syverson saw a woman driving the Corvette immediately before the accident. In fact, Engesser's attorney hired two investigators in an effort to find people who may

_____

[6] Engesser sought to have Boyle's statements admitted through Dennis Finch. The trial court refused to admit this hearsay evidence and the South Dakota Supreme Court affirmed on direct appeal. This court also rejected Engesser's claim that the trial court should have admitted Boyle's statements through Finch in Engesser's first federal habeas petition. *See* 04-5065, Docket 25, Order Adopting Report and Recommendation.

have seen the driver of the Corvette. *See* Transcript, Second State Habeas, 06-578, at 102, 111. Because Syverson did not speak to law enforcement after the accident and there was no record of him seeing the accident, he could not have been discovered through the exercise of due diligence. Thus, Syverson's testimony demonstrates that the factual predicate of Engesser's claim could not previously have been discovered. Consequently, Engesser has met the first requirement for presenting a successive petition.

Next, Engesser must demonstrate that the facts "establish by clear and convincing evidence, that but for the constitutional error, no reasonable factfinder would have found [him] guilty of the underlying offense." 28 U.S.C. § 2244(b)(2)(B)(ii). In other words, Engesser must demonstrate that if his trial attorney had been effective, no reasonable juror would have convicted him. Specifically, Engesser claims that his trial counsel was ineffective for failing to investigate and call eyewitnesses Fowler and Eckholm as witnesses at trial. During Engesser's trial, Trooper Fox was the only witness to testify that Engesser was the driver of the Corvette. This assertion was not refuted by Engesser's attorney, who appeared to focus on the fact that the Corvette was stored outdoors, permitting any bodily fluids inside the Corvette to deteriorate. If Engesser's attorney had interviewed Eckholm and Fowler, and called them as witnesses, their testimony would have directly contradicted Trooper Fox's assertion that Engesser was the driver of the Corvette. The identity of the driver was the only issue at Engesser's trial. If a factfinder were presented with

Eckholm's and Fowler's eyewitness testimony, no reasonable factfinder would have found Engesser guilty of the underlying offense. The only state court (Judge Macy) to have considered Eckholm's and Fowler's testimony and to weigh the testimony against the evidence presented at Engesser's trial found that their testimony would have changed the outcome of his trial. Moreover, Judge Macy reached this conclusion without the benefit of Syverson's eyewitness testimony, which demonstrates even more clearly that "but for the constitutional error, no reasonable factfinder would have found [Engesser] guilty of the underlying offense." 28 U.S.C. § 2244. Thus, Engesser has met the standard to present a successive petition under the AEDPA, and his ineffective assistance of counsel claim will be considered on the merits.

## II.   *Schlup* Gateway Claim

The proper standard for an actual innocence claim in a successive petition is unclear in the Eighth Circuit. Thus, this court analyzes Engesser's claim under the *Schlup* standard as well as the AEDPA standard for successive petitions. The *Schlup* standard excuses procedural default where a petitioner has presented credible evidence of actual innocence.

Generally, claims forfeited under state law cannot be the basis for federal habeas relief unless the petitioner can demonstrate cause and prejudice for the default. *See generally Murray v. Carrier*, 477 U.S. 478, 485 (1986); *Wainwright v. Sykes*, 433 U.S. 72, 87-88 (1977). But this bar is not unlimited. "In an effort to balance the societal interests in finality, comity, and

31

conservation of scarce judicial resources with the individual interest in justice that arises in the extraordinary case, the Court has recognized a miscarriage of justice exception." *House v. Bell*, 547 U.S. 518, 536 (2006) (internal citation omitted). In *Schlup v. Delo*, the Court set forth a rule for applying this principle. "*Schlup* provides that a habeas petitioner may obtain review of otherwise barred claims if he produces reliable new evidence not available at trial establishing that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Amrine v. Bowersox*, 238 F.3d 1023, 1028 (8th Cir. 2001) (*Amrine II*). Put another way, Engesser must demonstrate "that more likely than not any reasonable juror would have reasonable doubt." *House*, 547 U.S. at 538. This standard is demanding and permits review only in the extraordinary case. *Id.*

The Eighth Circuit Court of Appeals has interpreted the new evidence requirement to require not only evidence unavailable at trial, but "new reliable evidence which was not available at trial through the exercise of due diligence." *Kidd v. Norman*, No. 10-1375, slip op. at 11, 2011 WL 3795098, at *7 (8th Cir. Aug. 29, 2011); *Amrine II,* 238 F.3d at 1029. Engesser presented the testimony of Eckholm, Fowler, Smeenk, Boyle, Syverson, and Gillies at his federal evidentiary hearing. Thus, the court must consider whether this evidence meets the standard.

Both Eckholm's and Fowler's testimony was available at trial; both were disclosed in the discovery materials as witnesses to the crash. Here the

anomaly facing Engesser is that his actual innocence gateway claim is predicated upon his trial counsel's initial failure to exercise due diligence when he failed to interview either Eckholm or Fowler. But this evidence does not meet the *Amrine II* standard. Therefore, it cannot be considered in determining whether it is more likely than not that no reasonable juror would have convicted Engesser in light of the new evidence.

Smeenk's testimony was not available at trial; Smeenk did not come forward until 2007. Thus, his testimony would not have been available to Engesser at trial through the exercise of due diligence.

Engesser knew about Boyle's testimony prior to his trial. Boyle did not testify because he was a fugitive. Although his testimony may not have been available through the exercise of due diligence because he fled the jurisdiction, Boyle does not qualify as new evidence.

Syverson's testimony was not available at trial through the exercise of due diligence. The fact that he witnessed Finley driving the Corvette a few minutes prior to the crash was not discovered until several weeks before the federal evidentiary hearing. Although he stopped at the scene of the accident, Syverson did not speak to law enforcement. Consequently, he could not have been discovered through the exercise of due diligence.

Gillies testified that she had known Finley since 1992. Given this fact, the court cannot conclude that her testimony is new evidence which was not available at trial through the exercise of due diligence. Thus, witnesses

33

Smeenk and Syverson qualify as new reliable evidence of Engesser's factual innocence.

Engesser also introduced several exhibits at his hearing. Petitioner's exhibit 2 was a headshot of Dorothy Finley taken when she ran for Meade County Treasurer, which was around the time of the accident. It was used to illustrate Finley's hairstyle. The photograph shows that Finley had a short, full hair style. Her hair is medium brown, with blond highlights in the front. Petitioner's exhibit 3 was a map of the area of the accident, which was used solely for demonstrative purposes. Petitioner's exhibit 4 was a photograph of Engesser in the hospital, taken shortly after the accident. The photograph shows that Engesser had short, dark, frizzy hair and a mustache. This was shown to Syverson and he was asked if the driver of the Corvette had facial hair. This exhibit also contradicts Rensch's testimony in the state habeas proceeding that Eckholm's description of the driver (blondish hair that blew in the wind) was more consistent with Engesser than Finley. Petitioner's exhibit 5 was Trooper Fox's initial report, which stated that Finley was the driver. At the federal evidentiary hearing, Engesser's attorney explained that he introduced the initial report to show that there may have been an assumption that Finley was the driver, and as a result, the trooper's questions to the individuals who witnessed the accident did not focus on the identity of the driver. Petitioner's exhibit 6 was a series of photographs of Finley's body at the accident scene. Engesser's attorney noted that the photographs show what appears to be a

34

bracelet on her wrist, which would be consistent with Eckholm's testimony that he saw jewelry on the driver.

Respondent introduced one exhibit—a memo that Trooper Fox wrote indicating that he followed up with the witnesses to the accident. With the exception of the map and the headshot of Finley, all of these exhibits are contained in the state court record. The map was offered solely for demonstrative purposes and the headshot of Finley would have been available to Engesser's attorney at trial. Thus, these exhibits are not "new evidence" that could not have been discovered through the exercise of due diligence.

Another feature of the *Schlup* standard is the weighing of the evidence. "*Schlup* makes plain that the habeas court must consider " 'all the evidence,' " old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under 'rules of admissibility that would govern at trial.' " *House*, 547 U.S. at 538 (quoting *Schlup*, 513 U.S. at 327-28 (quoting Friendly, *Is Innocence Irrelevant? Collateral Attack on Criminal Judgments*, 28 U. Chi. L. Rev. 142, 160 (1970))). More specifically, "[i]n deciding whether a petitioner has made the necessary showing of innocence, a federal court must make its own determination of whether the 'probative force of the newly presented evidence in connection with the evidence of guilt adduced at trial' is sufficient to warrant consideration of the otherwise barred claims." *Amrine v. Bowersox*, 128 F.3d 1222, 1227 (8th Cir. 1997) (*Amrine I*) (quoting *Schlup*, 513 U.S. at 330-32).

Smeenk's and Syverson's testimony demonstrate that it is more likely than not that a reasonable juror would have had reasonable doubt. The sole question at Engesser's trial was whether he was driving Finley's Corvette at the time of the crash. Judge Macy found that the evidence against Engesser was weak. The only witness to testify that Engesser was the driver was Trooper Fox, who by his own admission, was inexperienced and the least senior officer on the scene of the accident. Engesser's position in the median relative to the Corvette was a key piece of evidence in the state's theory of the case. Smeenk's testimony places Engesser significantly further from the Corvette and establishes that he, rather than Engesser, opened the driver's side door. More importantly, Syverson testified that he had an opportunity to observe the driver of the Corvette for nearly a third of a mile while the Corvette was parallel to him on the on-ramp near Sturgis. Syverson testified that the driver had feminine features and feminine hair. He also noticed that the driver was small in stature. Finley was a petite woman; Engesser is 5'9" tall. These observations were made no more than four minutes before the accident. This eyewitness evidence directly contradicts the weak evidence presented by the state. When this new evidence is weighed against the evidence presented at trial, reasonable doubt remains. Thus, Engesser has demonstrated "that more likely than not any reasonable juror would have reasonable doubt." *House,* 547 U.S. at 538.

If Eckholm's and Fowler's testimony is also considered, the probative value of the evidence the state presented at trial dwindles even further. While this evidence does not qualify as "new evidence" under *Amrine II*, *House* indicates that the court is to broadly review the available evidence in determining whether a petitioner has demonstrated that more likely than not a reasonable juror would have reasonable doubt. *House*, 547 U.S. at 538. Eckholm testified that he saw jewelry and a woman's hands on the driver when the Corvette narrowly missed hitting him. He also testified that he saw the passenger be ejected from the Corvette when it struck the minivan. Fowler saw a man's leg and boot when the man was ejected though the air. The accident happened right in front of them, as the Corvette nearly struck Eckholm, who was on foot, and Fowler's van. Both also testified that Engesser's position in the median was significantly farther from the Corvette than the evidence presented at trial. When Judge Macy considered their testimony, he found their testimony to be credible and consistent with the physical evidence. Fowler also testified that she saw a woman driving the Corvette earlier in the day. But even if this court did not consider Eckholm's and Fowler's testimony, Engesser has made the requisite showing. After reviewing the evidence available at trial and the new evidence, the court concludes that "it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Amrine II,* 238 F.3d at 1028.

37

### III.    Engesser's Ineffective Assistance of Counsel Claim

Because Engesser has satisfied both the AEDPA conditions for filing a successive petition and the *Schlup* gateway standard, the court considers his procedurally defaulted claims on the merits. Engesser's petition is unique because a lower state court considered his ineffective assistance of counsel claim on the merits before its decision was vacated by the South Dakota Supreme Court.[7] Thus, this court directed the parties to brief whether the court should "look through" the South Dakota Supreme Court's decision reversing the grant of habeas corpus to the state circuit court's decision because the South Dakota Supreme Court's decision appears to find that Engesser's claim was procedurally defaulted under state law. *See Worthington v. Roper,* 631 F.3d 487, 487 (8th Cir. 2011) ("[W]hen a state appellate court affirms a lower court decision without reasoning, we 'look through' the silent opinion and apply AEDPA review to the 'last reasoned decision' of the state courts.") (internal citations omitted). Respondent asserts that this court may not defer to the state circuit court's decision, but rather must defer to the South Dakota Supreme Court's opinion reversing the grant of habeas corpus.

---

[7] Because at least one state court has considered Engesser's procedurally defaulted claim on the merits, this court will apply the AEDPA standard of review to his claim rather than evaluating it under *Strickland* as would be the case for a claim that had never been addressed by a state court. *See, e.g., House v. Bell*, No. 96-883, 2007 WL 456844 (E.D. Tenn. Dec. 20, 2007) (evaluating a procedurally defaulted claim under *Strickland* after the United States Supreme Court found the petitioner satisfied the gateway standard of *Schlup*).

In support of its position, respondent cites *Harrington v. Richter*, 131 S. Ct. 770, 784 (2011) and asserts that *Worthington* no longer applies. Specifically, respondent asserts that "determining whether a state court's decision resulted from an unreasonable legal or factual conclusion does not require that there be an opinion from the state court explaining the state court's reasoning." *Harrington*, 131 S. Ct. at 784. But the state court decision that was the subject of *Harrington* was a summary denial, not a reasoned opinion, as is the case here. Moreover, the Court in *Harrington* clarified the general rule it announced, explaining that "when a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits *in the absence of any indication or state law procedural principles to the contrary*." 131 S. Ct. at 784-785 (emphasis added).

The South Dakota Supreme Court's opinion is explicit in noting that Engesser failed to make the threshold showing required to present a successive petition in state court. The court states:

> Before addressing the issues raised on appeal, *we reiterate a petitioner's burden of proof when seeking a second or subsequent habeas based on ineffective assistance of counsel claims*. . . . We said, 'ineffective assistance of counsel at a prior habeas proceeding is not alone enough for relief in a later habeas action. Any new effort must eventually be directed to error in the original trial or plea of guilty.' Even though the challenge must eventually show error in the underlying trial or plea, the habeas applicant must *first show that the prior habeas counsel was ineffective*. Perhaps, this step has not been emphasized enough in our cases."

*Engesser*, 759 N.W.2d at 312 (quoting *Jackson v. Weber*, 637 N.W.2d 19, 23 (S.D. 2001)) (emphasis added).

It appears that the South Dakota Supreme Court relied on *state law procedural principles* to find that Engesser's underlying ineffective assistance of trial counsel claim was procedurally defaulted. The court continued, stating "[c]onsequently, for Engesser to prevail in this second habeas challenge, he must show that his first habeas counsel was ineffective. We do not believe he has made that showing." *Id.* at 313. Thus, the South Dakota Supreme Court did not adjudicate Engesser's ineffective assistance of trial counsel claim on the merits, and this court will apply AEDPA review to the state circuit court's decision because it is the last reasoned decision of the state courts on the claim. *See Worthington*, 631 F.3d at 497; *Mark v. Ault*, 498 F.3d 775, 783 (8th Cir. 2007) ("Because the Iowa Supreme Court denied Mark review, we apply the AEDPA standard to the decision of the Iowa Court of Appeals because it is the 'last reasoned decision' of the state courts.") (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991)).

Federal relief is barred under § 2254 unless "the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or unless the state court decision "was based on an unreasonable determination of the facts in light of the evidence presented. . . ." 28 U.S.C.

§ 2254(d). Under the AEDPA, it is not enough to find that the state court applied clearly established federal law erroneously or incorrectly—the application must also be unreasonable. *Williams v. Taylor*, 529 U.S. 362, 411 (2000) (an unreasonable application of federal law is different from an incorrect one). Accordingly, a federal court applies a deferential standard of review when assessing a state court's disposition of a state habeas petition. *See Barnett v. Roper*, 541 F.3d 804, 814 (8th Cir. 2008). A state court's determination of the facts is also entitled to respect. "In a proceeding instituted by an applicant for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, *a determination of a factual issue made by a state court shall be presumed to be correct*[.]" 28 U.S.C. § 2254(e)(1) (emphasis added).

Judge Macy found that the testimony presented at trial was that there were no eyewitnesses to the accident and that consequently "the habeas testimony of Eckholm and Fowler directly contradicts the evidence presented by the State at trial." Attachment 1 at 5, ¶ 19. Moreover, the South Dakota Highway Patrol never marked the location of Engesser's body in relation to the scene of the accident. *Id.* at 5, ¶ 20. Judge Macy also observed that "the only individual at the jury trial to testify that Engesser was the driver was Trooper Fox, who at the time of the accident had less than three years experience with the South Dakota Highway Patrol, was the least experienced trooper on the

scene, and was not certified to complete accident reconstructions." *Id.* at 6, ¶ 24. Judge Macy also found that both Eckholm and Fowler were "credible witnesses without identifiable bias[es]." *Id.* at 7, ¶¶ 30, 31. Judge Macy declined to consider Smeenk's testimony, but he did find that it was consistent with Eckholm and Fowler's testimony. See Transcript, Motions Hearing, Second State Habeas, 06-578, at 13-14.

After these findings of fact, Judge Macy concluded that Engesser received ineffective assistance of trial counsel. He reasoned that "an attorney preparing a case must make a reasonable investigation in preparing a case or make a reasonable decision not to conduct a particular investigation." Attachment 1 at 8, ¶ 3 (citing *Foster v. Lockhart*, 9 F.3d 722, 726 (8th Cir. 1993)). Thus, trial counsel Rensch's decision not to interview Eckholm and Fowler, which he categorized as "two eyewitnesses disclosed early on in discovery" was unreasonable. Judge Macy also found that Eckholm and Fowler "will likely be considered credible and not subject to substantial impeachment at trial." *Id.* at 9, ¶ 7. He also found that the "strength of the evidence presented by the prosecution at the jury trial was weak" and that "the eyewitness testimony of Eckholm and Fowler would have likely altered the outcome of the original jury trial." *Id.* at 9, ¶ 9. Accordingly, Judge Macy found that "Engesser was not afforded effective assistance of counsel at trial" and

that this "deprived [him] of his basic constitutional right to a fair trial." *Id.* at 10, ¶ 11 (citing *Jackson,* 637 N.W.2d at 19).

The state court's evaluation of Engesser's ineffective assistance claim was not an unreasonable application of federal law. Under *Strickland*, an attorney's choices are not entitled to deference unless they are informed by adequate investigation into the facts. An attorney's "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland v. Washington*, 466 U.S. 668, 690-91 (1984). "*Strickland* simply does not require . . . deference to decisions that are uninformed by an adequate investigation into the controlling facts and law." *Anderson v. Johnson*, 338 F.3d 382, 392 (5th Cir. 2003). Nor is it reasonable to rely exclusively on the investigative file of the government. *Thomas v. Lockhart*, 738 F.2d 304, 308 (8th Cir. 1984). The state trial court correctly concluded that Engesser's trial attorney's failure to interview two eyewitnesses, who were disclosed to him in discovery, was professionally unreasonable. Judge Macy's conclusion that Engesser was prejudiced by this failure is also reasonable. After reviewing Eckholm's and Fowler's testimony and comparing their testimony to the evidence presented at trial, Judge Macy concluded that Engesser was prejudiced by his attorney's failure to interview and call the two individuals as witnesses. Judge Macy reviewed the evidence presented by the

43

prosecution and concluded it was weak. Therefore, his conclusion that "but for counsel's unprofessional errors, the result of the proceeding would have been different" is not an unreasonable application of federal law. *Strickland*, 466 U.S. at 694. Accordingly, it is

ORDERED that Engesser's petition for a writ of habeas corpus (Docket 1) is granted pursuant to 28 U.S.C. § 2254.

IT IS FURTHER ORDERED that respondent's motion to dismiss (Docket 25) is denied.

IT IS FURTHER ORDERED that respondent's objection to the evidentiary hearing is overruled.

Dated September 30, 2011.

BY THE COURT:


/s/ *Karen E. Schreier*
KAREN E. SCHREIER
CHIEF JUDGE